# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### March 5, 2013 Session

## STATE OF TENNESSEE v. ZACHARY CARLISLE

**Appeal from the Criminal Court for Shelby County**
**No. 11-03600   James M. Lammey, Jr., Judge**

---

**No. W2012-00291-CCA-MR3-CD  - Filed October 7, 2013**

---

The Defendant, Zachary Carlisle, was convicted by a Shelby County Criminal Court jury of voluntary manslaughter and employing a firearm during the commission of a dangerous felony, Class C felonies. *See* T.C.A. §§ 39-13-211, 39-17-1324 (2010). The trial court sentenced him as a Range III, persistent offender to fifteen years' confinement for the voluntary manslaughter conviction and to a consecutive fifteen years' confinement as a violent offender for the firearm conviction. On appeal, the Defendant contends that (1) the indictment for the firearm conviction failed to charge an offense, (2) the evidence is insufficient to support his convictions, (3) the trial court erred in failing to instruct the jury on self-defense, and (4) the trial court committed plain error by instructing the jury that the Defendant's statements could qualify as a confession. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JERRY L. SMITH and ROGER A. PAGE, JJ., joined.

Lance Randall Chism (on appeal) and Jacob Edward Erwin (at trial), Memphis, Tennessee, for the appellant, Zachary Carlisle.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; Michael R. McCusker and Jose Francisco Leon, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

This case involves the 2009 shooting death of Michael Neal Krauss. At the trial, Doris Jean Krauss, the victim's mother, testified that she last saw the victim on April 4, 2009, about 8:30 p.m. after she had dinner with him, her mother, and her brother. The victim told her he was going to visit friends and would return around 1:00 a.m. She said an officer knocked on the door around 4:00 a.m. and told her husband and her that their son had been killed two or three blocks from their house.

Ms. Krauss identified the victim's cell phone and its number. She said the phone had been locked in a safe in their house since her husband collected the victim's personal belongings. She identified a list of the calls that had been made and received from the victim's phone, which she said she downloaded from AT&T because she wanted to know what happened before the victim died. She said she saw incoming calls moments before the shooting occurred and sent the list to Sergeant Connie Justice.

Ms. Krauss testified that she knew the victim experimented with drugs around the time of the murder and knew he drank alcohol. She said the victim lived with her husband and her and was employed as a stagehand for Crew Line. She said the victim played the guitar and mixed recordings, had recently finished producing a CD for a friend, and had an electronic studio in Memphis.

Ms. Krauss testified that the victim had mentioned a person named Ben, for whom the victim had done work, but that she did not know Ben's last name. She said Ben came to her house with Max, a friend of the victim's who was living with them. She said Max told her later that Ben was the Defendant's brother. She said Ben, Max, and the victim worked together and sometimes rode to work together.

Mark D. Cooke testified that he was about fifty feet away when the victim was shot. He said the shooting happened on Cox Street where they went to meet someone. He said that before they went to Cox Street, they were at a house on Landis Street where he was staying all evening. He said that Ed Hampton and Chris Branson lived at the house and that he stayed there occasionally. He said they were all playing poker and drinking beer. He said that Mr. Branson was dying of cancer and in pain and that Mr. Branson and the victim were trying to find something to ease his pain.

Mr. Cooke testified that he arrived at Landis Street around 6:00 or 7:00 p.m. and started drinking. He said he left with the victim around 1:00 or 1:30 in the morning for what he thought was a trip to buy more beer but later realized was for the victim to meet a man to buy drugs for Mr. Branson. He said that they walked to the Mapco at the corner of Cooper

and Central Streets to meet the man but that he was not there.  He said the victim picked up a green flyer at the Mapco, tore it into strips, and wrapped a dollar bill around it.  The victim told him he did not have any money but was going to make an exchange with the man he was meeting.  They walked to Cox Street to meet the man closer to the victim's house.

Mr. Cooke testified that the victim called the man he was meeting two or three times when they were walking and asked why he did not meet them at Mapco.  He said that when they were crossing the railroad tracks, the victim called the man again and said, "Zak, where you at," and that about that time, they saw a man walking toward them.  The victim told "Zak" that he could see him and that they were crossing the tracks.  He said that it was dark but that he saw a figure walking down the street about four or five blocks away.  He said they walked three or four blocks on Cox Street almost to Vinton Street and stopped about ten or twenty feet from the corner.  He said the victim told him to "hang back," met the man at the corner, and made the exchange.  He said that when the victim returned, he walked a little faster and said, "Come on, let's go."  He said that the man stopped them and that although he could not remember the exact words, the man stated, "Wait a minute," and, "What the h--- you trying to pull? – what's going on?"

Mr. Cooke testified that he stopped when the man came behind them but that the victim kept walking.  The man pulled a pistol and walked past him.  He said that the victim did not run but walked faster and that the man tried to hit the victim with the pistol.  The victim ran around a parked car on the street because the man was trying to "pistol whip" him to retrieve the drugs.  The victim and the man ran around the car twice and ran into a yard.  Mr. Cooke stated that they were wrestling and that the victim was bent over.  He said he was about fifty feet away and did not know if the two were wrestling over the gun or if the man caught the victim.  He said he heard a "click, click, and pop."  He said that the man went back to the middle of the street, put his pistol away, glanced at him, and walked back down the street from the same direction he came.

Mr. Cooke testified that after he heard the "click, click, pop," he went to the victim, who was standing in the middle of the street.  The victim asked him if he was shot, and he told the victim he did not see any blood.  He said that they walked about another block, that a man was on a front porch with a cell phone, and that he asked the man to call 9-1-1.  He said the victim died before the ambulance arrived.

Mr. Cooke testified that he did not have a clear view of the shooter because he was wearing a "hoodie" and only part of his face could be seen. He said, though, the shooter was white and in his late twenties or early thirties.  He said that when he returned to Landis Street and told Mr. Branson the victim was shot, Mr. Branson told him who Zak was.  He said he

did not have a weapon that night. He said that he had only known the victim for about one month but that everyone said the victim was non-violent and passive.

Mr. Cooke testified that after the shooting, the ambulance and police arrived in less than two minutes. He said the police placed him in the back of a patrol car and asked him questions. He said he did not know the victim's last name and called the Landis Street house to ask someone. He stated that the police took him to the homicide division, that Sergeant Justice asked him questions, and that he answered all of them.

Mr. Cooke testified that he told Sergeant Justice the same thing he told the jury but omitted that the meeting was a drug transaction. He said he lied because he had heard the victim's parents had lost one son tragically and wanted them to think the victim died in a robbery rather than a drug transaction. He said he was also worried because the shooter was still free. He stated that his boss told him to call Sergeant Justice and tell her the entire story. He said that a few days after he gave his first statement, he contacted Sergeant Justice and told her the entire story. He said that when he was at the homicide division, he was "pretty shattered" because he had never seen anyone killed and was shocked. He said he called Sergeant Justice because his conscience bothered him after he did not tell her the first time and because he wanted to avoid legal problems for himself for not telling the entire truth.

On cross-examination, Mr. Cooke testified that he talked about the shooting at the scene with the officers, Sergeant Justice, and later with his and the victim's friends. He agreed the information he heard after the shooting "filled in some blanks" for him. He did not know the Defendant or Ben Carlisle but received more information after talking to everyone. He said he spoke with one of the prosecutors but not the other or the investigators from the district attorney's office. He said it had probably been a year since he spoke to Sergeant Justice. He said that he and one prosecutor had discussed his testimony, visited the scene a couple of days before the trial, and walked through what happened that night.

Mr. Cooke testified that he first told Sergeant Justice that a robbery occurred. He said two weeks may have passed before he made his second statement to Sergeant Justice. He agreed he had been drinking from about 6:00 or 7:00 p.m. until about 12:00 or 1:00 a.m. on the night of the shooting but denied he was drunk. He said the three or four people at the house may have split a twelve-pack of beer. He denied smoking marijuana or using cocaine that night and denied seeing the victim use drugs. He said the drugs they bought were for Mr. Branson, not for him or the victim. He said the victim went to buy drugs because he felt sorry for Mr. Branson and wanted to ease his pain. He said that although he knew trouble was possible when he saw the victim create a fake wad of money, he went along with the plan.

Mr. Cooke testified that his first and second statements to Sergeant Justice were not completely different but that he added facts in the second statement. He denied that Sergeant Justice told him he could be charged with involvement in the murder but said his boss told him he could and advised him to call Sergeant Justice. He said he did not change his statement because Sergeant Justice told him he might be charged but because of his conscience and his boss's advice. He agreed that in his second statement to the police, he told Sergeant Justice that the meeting was a drug deal and that he heard the victim identify the caller as Zak, which he did not tell the police during his first statement. He said he did not think the information was important and was in shock after seeing the victim shot. He said he did not initially tell the police the name because he was afraid.

Mr. Cooke testified that he talked to his friends in the two weeks following his initial statement, that they talked about telephone numbers, and that he learned Zak's last name. He denied that Sergeant Justice talked to him about the telephone records and gave him the Defendant's name. He said he did not perform his own investigation but learned the Defendant's name by talking to other people. He said he provided a DNA sample to the police to exclude himself as a suspect.

Mr. Cooke testified that he remembered a short interview with Tony Geiser, a private investigator, but did not remember what was said. He did not tell Mr. Geiser that he first heard the name Zak when the police showed him the victim's phone records. He said he heard the victim say Zak's name during his telephone call the night of the shooting.

Mr. Cooke testified that he was about twenty or thirty feet from the victim and the shooter. He said that it was about 2:00 a.m. and dark and that he had been drinking but was not "high." He said that he saw the victim and the shooter exchange something hand-to-hand and that the victim returned to where he was standing. He said the shooter came toward them and pulled out a dark-colored handgun, which he thought was an automatic because it did not have a barrel like a revolver. He said he did not see much after he saw the victim and the shooter lean over struggling with each other and did not see the shot. He said that after he heard the shot, neither the victim nor the shooter ran but stood up and walked in different directions.

Brian Nelson testified that he was incarcerated for robbery at the time of the trial. He said he knew the Defendant from their drug transactions in January and February 2009. He said that on April 3, 2009, he was at his friend Ronnie's house and that Ronnie was a drug dealer. He said that Ronnie received a telephone call from the Defendant's brother's telephone number, that Ronnie thought he was talking to the Defendant's brother, Ben, but that Ronnie talked to the Defendant. He said the Defendant called Ronnie late that night to buy an "eight ball" of cocaine. He said that Ronnie and the Defendant were supposed to

meet at Mapco but that Ronnie picked up the Defendant and drove down Cox Street. He said that the Defendant did not have all the money Ronnie wanted for the drugs because the drug deal was with another person and that Ronnie was mad because it was 12:30 or 1:00 a.m. and he wanted to go home. He said the Defendant called the other person named Mike and told him where to meet. He said that Ronnie parked on the street and that they saw Mike and another man walking up the street. He said he, Ronnie, and the Defendant were in the car, that Ronnie and the Defendant had guns, and that the Defendant was wearing a "hoodie."

Mr. Nelson testified that the Defendant walked across the street and four or five houses down. He said the drug transaction was between Mike and the Defendant, although another person was with Mike. He stated that Mike and the Defendant approached each other and stopped and that Mike handed something to the Defendant and turned to leave. He said that as Mike was leaving, the Defendant ran to grab him. He said that the Defendant chased Mike around a car and that a "tussle" occurred. He heard a gunshot and saw Mike grab his neck or his face and run up a cobblestone or brick walkway or driveway leading to a house. The Defendant ran to the car where Mr. Nelson and Ronnie were sitting and said, "This mother f----- tried to get me." Mr. Nelson said that he and Ronnie were "trying to get out of there" because it was late at night, the Defendant had drugs, and a shot had been fired. He said that the Defendant gave Ronnie money and that Ronnie broke off a piece of cocaine for the Defendant and told him to get out of the car.

Mr. Nelson testified that he was sitting in the car "caddy corner" from the street when he saw the shooting. He said that the Defendant had a black, nine-millimeter gun in his hoodie that night. He said he did not see the victim draw a weapon.

Mr. Nelson testified that he spoke with Sergeant Justice in February 2010, around four or five months after he was arrested. He said that he contacted Sergeant Justice because he was losing sleep after he learned the victim was killed and that he did not want anything from talking to her. He said he talked to Sergeant Justice once for a couple of hours and thought he may have spoken with her again before the trial. He said he did not talk to Sergeant Justice sooner because he did not want to get involved and did not know someone died until later. He said that he contacted Sergeant Justice after he was arrested because he wanted to come forward, that Sergeant Justice did not make any promises to him, and that he did not ask for anything. He said his signature was on the photograph lineup from which he had identified the Defendant for Sergeant Justice.

Mr. Nelson testified that after the shooting, he returned to Ronnie's house and that Ronnie took him home. He said that the shooting happened on Friday and that he talked to the Defendant the following Tuesday about a drug transaction. He said the Defendant told him that the police found a nine-millimeter automatic handgun but that it was not his gun and

that the Defendant's brother was going to dispose of the gun because they had more guns. Mr. Nelson told the jury his and Ronnie's cell phone numbers.

On cross-examination, Mr. Nelson testified that he spoke to the Defendant by phone on the Tuesday following the shooting and that the Defendant called about drugs. He said he asked the Defendant, "What the hell was that all about?" The Defendant told him that the police found a gun but that it was not his. He said he had not talked to the Defendant since that Tuesday. He said he and the Defendant did not talk about the entire incident but did mention it briefly. He said he pleaded guilty to two counts of aggravated robbery and was serving his sentence at the time of the trial. He said that his sentence had not changed after he gave information to the police and that he did not think about the consideration the State would give him on his sentences if he gave information about the shooting. He denied being housed with the Defendant in jail, holding himself out as a paralegal while incarcerated, and reviewing the Defendant's case file, case notes, or possible motions in exchange for coffee. He said he did not meet the Defendant in jail, was not housed with him in jail, and was not removed from J Pod.

Mr. Nelson testified that the prosecutor asked him if he would testify for the State and told him what the case involved. He said that he asked for a copy of his statement but that the prosecutor did not go over his testimony with him. He stated that he told the prosecutor he was reluctant to testify and wrote a letter telling the prosecutor he did not want to testify but that he came to the trial anyway. He said he agreed to testify when the prosecutor asked him on the day of the trial.

Mr. Nelson testified that he did not know Ronnie's last name, that he had not known him long, and that their interactions were drug related. He said the telephone number he gave for Ronnie was the number he called to reach Ronnie but was unsure if the phone was Ronnie's. He said he smoked marijuana and drank beer on the night of the shooting. He said that Ronnie talked to the Defendant and that they met the Defendant at the Defendant's house after midnight. He said that when they arrived around 12:30 or 1:00 a.m., the Defendant was eating what he thought was food from a Krystal Restaurant. He said that Mapco was the initial meeting place for the drug transaction but that Ronnie would not stop because too many people were around. He said he heard the name Mike during the Defendant's phone conversation and before they parked for the Defendant to exchange the drugs. He said he did not talk to the man the Defendant met on the street. He said that he was one-half block or less from the Defendant and Mike and that the car was parked across the street diagonally from where the transaction took place. He stated that the Defendant and Mike stopped in the street, that he saw the Defendant's back and saw hand movements, that Mike turned to walk away, and that the Defendant grabbed Mike. He said they started "tussling" and chased each other around a car. He said he saw the Defendant grab something black from his hoodie,

which he assumed was a gun because the Defendant had a gun in the car and because he heard a pop. He stated that Mike grabbed his neck and walked away quickly, that the man with Mike went the opposite direction, and that the Defendant returned to the car, took the cocaine for which he had paid, and left the car. Mr. Nelson said that he was at the Annex with the Defendant but not housed with him and that he had seen the Defendant in the county jail but had not spoken to him.

On redirect examination, Mr. Nelson testified that he was convicted of aggravated robbery and that his sentence was within the appropriate range. On recross-examination, Mr. Nelson said that he was sentenced as a mitigated offender but that he had a felony conviction in Nevada.

Jonathan Miles Henderson testified that a man was shot outside his house on South Cox Street on April 3, 2009. He said that when he heard gunshots, he went outside, saw two men run past, and asked if everything was "okay." He said that one man stated they had been robbed and that the other man stated he had been shot and fell in the walkway. He said that when the man fell, he called 9-1-1, rolled the man over to check on him, and talked to him. He did not recall how long it took the police and ambulance to arrive. He identified photographs of the house and of the victim lying on the walkway. He said that after the police arrived, he told them what he saw. He said he spoke to the victim and attempted to have the victim respond. He said that the victim muttered something but that he could not understand him.

On cross-examination, Mr. Henderson testified that he was not outside when he heard the gunshots and that he did not see what happened. He described the victim's companion as white, middle-aged, and wearing a baseball cap and flannel shirt. He said he did not speak to the man other than to ask if everything was okay and the man's responding that they had been robbed.

William Hamilton Smythe, IV, the president of Yellow Cab Company, testified that he provided business records from 2009 to the police department. He identified a "printout" about an April 3, 2009 trip. He said that the company received a call at 9:35 p.m. from a passenger named Zak requesting to be picked up at the Krystal Restaurant on Union Street and taken to South Cox Street. He said that the order was dispatched by an automated dispatcher one minute after it was received and that the driver in cab number seventeen accepted the order four minutes after the call. He said the cab's meter was turned on at 9:41 p.m. and off at 9:44 p.m.

Kevin Grills testified that in April 2009, he worked for Yellow Cab. He said he remembered being dispatched to the Krystal Restaurant on Union Street but did not

remember the date. He said he picked up a young, Caucasian man, who was informally dressed and not talkative. He said he took the passenger one-half to one mile to Cox or Edgewood Street.

On cross-examination, Mr. Grills testified that he did not remember the trip because the police talked to him about it but that he remembered trips that stood out. He said that he drove a taxi for seven years and developed a "sense" about situations and that he had a bad feeling about the trip. He said he did not remember the passenger's having a bag or eating during the drive.

Memphis Police Officer Kevin Barrett testified that in April 2009, he worked the midnight patrol shift and was assigned to the Midtown ward. He said he responded in two or three minutes to a call from the dispatcher as "shots fired/man down." He said that he was the first officer at the scene and that he saw a man on one side of the road, the victim down on the other side of the road, and a man holding a towel over the victim's chest and neck. He said the victim was a white male with dark hair wearing shorts and a dark jacket and was bleeding from the neck. He said the man holding the towel stated that he was the homeowner and that the man across the street was a witness. He said that after he determined the victim was deceased, he secured the scene, placed the homeowner and the other witness in separate patrol cars, and hung crime scene tape around the area. He said a dark-colored Acura parked on the opposite side of the street was towed to the city lot to be processed.

On cross-examination, Officer Barrett testified that the Acura was about forty-five feet north of the house where the victim was found. He described the witness across the street as white with gray or blond hair and in his late thirties to early forties. He said that the witness was upset or shocked but that he did not remember if the man seemed intoxicated. While in the patrol car, the witness said the suspect wore a dark hoodie. He said the witness did not use the word "robbery" and said the shooter appeared to be someone the victim knew. The witness told him that he did not know the shooter, that the victim and the shooter "had words," that the shooter chased the victim around the car, and that a shot was fired. He said the car was towed because of the chase around it.

Memphis Police Officer Charles Cathey testified that he checked a blue Acura for fingerprints on April 4, 2009. He said that he found no ridge details or fingerprints but that the results were not unusual because the person may not have touched the car or may have worn gloves.

Memphis Police Sergeant David Beckham testified that he worked in the crime scene unit in April 2009 and that he was called to Cox Street to process a homicide in the early morning hours of April 4, 2009. He identified a sketch he made of the crime scene and a

picture of a blue Acura parked across the street from the scene. He said the car was not included on the crime scene sketch because no evidence was found on the car. He said he did not find any firearms or casings at the scene.

On cross-examination, Sergeant Beckham testified that when he arrived, he made sure the scene was secure and began gathering information. He said he learned the car may have been part of the altercation and looked around the car for evidence. He said that if there was a shooting with a handgun, it would have involved a revolver or an automatic.

Sergeant Beckham testified that he processed the area around the victim first and did not find a firearm, casings, or footprints. He said he did not perform a gunshot residue test on the victim and was unaware if anyone else did. He said the medical examiner always placed a paper bag on each hand to secure evidence.

Sylvia Gallaher, the Defendant's aunt, testified that she placed the Defendant's mother and brother on her family cell phone plan. She identified Benjamin Carlisle's cell phone number and said she provided the phone for him. She said he was in the Med in early April 2009 at the time the shooting occurred but did not know whether his family was with him during that time.

Dr. Marco Ross, deputy chief medical examiner and forensic pathologist at Shelby County Medical Examiner's Office, performed the victim's autopsy. He said the victim had a gunshot entrance wound on the left side of the base of his neck and died from a gunshot wound to the torso. He classified the death as a homicide. He said a gray mark leading to the gunshot wound on the victim's torso indicated the direction of travel was above and to the left of the victim's head. He said that no stippling or soot was found on the body, which indicated the distance between the muzzle of the gun and the victim's skin was at least three feet. He said the wounds on the victim's arms were consistent with a "defensive posture." He said toxicology testing showed the presence of alcohol, marijuana, and cocaine. He identified a bullet found in the left back of the victim.

On cross-examination, Dr. Ross testified that the victim had a needle or puncture mark on his arm. He said the toxicology report showed that the victim was a recreational marijuana and cocaine user, that he probably smoked marijuana within twenty-four hours of his death, and that he probably used cocaine within twelve hours. He said the victim had a blood alcohol content of twenty-seven milligrams per deciliter.

Memphis Police Sergeant Connie Justice testified that she was assigned to investigate the victim's homicide. She said she arrived at the scene around 3:55 a.m. on April 4, 2009, and found the victim shot to death. She said that a witness, Mark Cooke, who was with the

victim, was present and that a vehicle was in the pathway of the incident. She said she stayed at the scene thirty to forty minutes before going to the station to interview Mr. Cooke. She said she interviewed Mr. Cooke and took a typewritten statement from him that he reviewed and signed. She said Mr. Cooke was pleasant and polite but seemed nervous and was upset he was involved. She said that after her initial meeting with Mr. Cooke, she concluded the shooting was part of an attempted robbery.

Sergeant Justice testified that after she took Mr. Cooke's statement, she took him home and received the victim's cell phone records from the victim's mother, who had obtained them from an online account. She said she found nine calls between a number beginning with 487 and the victim's phone. She said the calls were made around the time of the victim's death. She determined that the 487 number belonged to Benjamin Carlisle, whose address was on South Cox Street two houses from where the shooting occurred. She learned Mr. Carlisle had been in the hospital since April 1, 2009.

Sergeant Justice testified that she went to the hospital to speak with Mr. Carlisle on April 7 and confirmed he had been there since April 1. She said that Mr. Carlisle was surprised to see the police, that he was cordial at first but nervous and sweating, and that he did not want to provide a lot of information. She said he told her his phone had been with him at the time of the shooting. She said that when she asked him about the nine phone calls between his phone and the victim's phone, he became visibly agitated, upset, and shaken and did not want to talk anymore.

Sergeant Justice testified that the Defendant's name was mentioned during the investigation and that she determined he lived on Cox Street. She said she subpoenaed records for the 487 number because she wanted an official copy and because the records showed the handset's location when calls were made or received. She identified the cell phone records and the maps showing locations identified by the phone records. She said that at 11:22 p.m. on April 3, 2009, the 487 number was used to call the hospital where Benjamin Carlisle was and that she concluded the phone was not with him at the hospital because he would not have needed to call the hospital if he was already there. She said that between 11:00 p.m. and 2:00 a.m., seven calls were made between the 487 number and a 281 number. She said that the victim's last phone call was received from the 487 number, that the call was at 1:52 a.m., and that in the ten minutes before the last call, nine calls were made between the victim and the 487 number. She said that she interviewed Ben Carlisle again, that he told her he had his phone with him at the hospital, and that the information about his phone being used to make and receive calls elsewhere must have been a computer glitch.

Sergeant Justice testified that she spoke to Mr. Cooke again about two weeks after she first interviewed him. She said that after she spoke with him again, she realized the incident

was a disagreement over a drug transaction, not a robbery, and that the Defendant was a potential suspect as the drug provider. She based her opinion on information from Mr. Cooke and other witnesses who overheard phone calls about the drug transaction.

Sergeant Justice testified that on June 12, 2009, she and Sergeant Merritt met with the Defendant when he was incarcerated, that he signed an "advice of rights" form, that she served him with a DNA search warrant for saliva, and that she interviewed him for about thirty to forty-five minutes. She said that she recorded what the Defendant said on a supplement form but that a formal statement was not taken because the Defendant ended the conversation. She said that the Defendant told her he moved to South Cox Street on May 31, 2009, but that utility records reflected that service began on March 2. He told her he ran from the house when the police came to take Benjamin Carlisle to the police station for his second interview about the cell phone records. She said the Defendant's DNA did not match any found on the victim. She said the gunshot residue kit collected from the victim was not submitted for testing because in her experience, the gunshot residue kit never showed anything other than inconclusive results.

Sergeant Justice testified that about eight months after the shooting, James Lee contacted her with information about the case and that he did not receive any benefit or promises for his help. She said that the information Mr. Lee gave was consistent with the theories she developed. She said that Brian Nelson contacted her around February 12, 2010, about the shooting and that he was not offered promises or benefits in exchange for his help. She said that Dennis Sullivan knew the Defendant and that he was not offered promises or benefits in exchange for his help.

On cross-examination, Sergeant Justice testified that she discovered the 487 number was registered to Benjamin Carlisle by searching the Memphis Light, Gas, and Water database, not the AT&T records. She said that the latitude and longitude coordinates given in the subpoenaed telephone records showed the location of the cell tower used when the call was made or received. She said that she and Lieutenant Martin Ellis entered the coordinates into Google to find the location of the tower. She said the "X" that marked the coordinates was handwritten by her or Lieutenant Ellis because the printout from Google did not include the pinpoint at the location shown on the computer screen. She said that during her investigation, she learned that the 281 number belonged to Indea Ann Michaels but that she did not subpoena the phone records to verify the owner.

Sergeant Justice said that the DNA analysis report from the Tennessee Bureau of Investigation (TBI) showed a mixture of genetic material and DNA from an unidentified individual on the victim's clothing. She said the Defendant told her he went out the back door when the police came to take his brother to the police station, that the police brought

him back inside the house, and that he gave them the information they requested. She agreed that Mr. Cooke lied to her in his first statement and that Mr. Nelson lied to her about his prior record.

On redirect examination, Sergeant Justice testified that the 281 number was associated with Indea Ann Michaels and a man named Ronnie, whom she described as a "dope provider." She said Ronnie was an associate of Brian Nelson.

Philji Johns, an AT&T radio access network engineer, identified the locations of two cell phone towers on a map and said that tower 78 was at the corner of Waldron Road and Union Avenue and that tower 69, which was the Midtown south tower, was at the corner of South Cox Street and Central Avenue. He said that when a cell phone was powered on, it "locked" onto the tower with the strongest signal, which was typically the closest tower. He said that when a call was made, the cell phone sent a signal to the tower with the strongest signal and that the signal was "handed off from tower to tower." He said AT&T's records showed where calls originated. He said that each tower had three antennas and that each antenna served a different sector. He said that when a call was placed, the cell phone registered with the tower and sector with the strongest signal.

Mr. Johns testified that the cell phone records for Benjamin Carlisle's telephone number showed the date, time, type, originating telephone number, receiving telephone number, duration, region of Memphis from which the calls were made, and the tower and sector the cell phone registered, which was tower 69, sector 1. He said that on April 3, 2009, Benjamin Carlisle's telephone number originated a call at 11:37:21 p.m. to Ronnie's telephone number and was used to call its voicemail at 1:47:05 a.m. He said these calls registered on tower 69 and either sector 1 or sector 3. He said that the victim's telephone number originated a call to Mr. Carlisle's number at 1:47:14 a.m. on April 4, 2009, and that the call registered on tower 32, sector 3, the tower located at Union Avenue Extended south of Poplar Avenue, which was in the same area as tower 69. He said that the next call from the victim's number to Mr. Carlisle's number returned to tower 69, which was at the corner of South Cox Street and Central Avenue, and that the number remained on the Cox Street tower until 9:06:31 a.m. He said that between 11:22 p.m. on April 3, 2009, and 9:00 the next morning, thirty calls were placed and that all the calls registered to the Cox Street tower except the call on the Union Avenue Extended tower, which could have been an anomaly or because someone with the cell phone moved. He concluded that the person with the telephone was close to the Cox tower because all the calls registered there.

On cross-examination, Mr. Johns acknowledged he did not know who had the cell phone at the time of the calls. He agreed he could not give a pinpoint location of the person who made the calls. He said that the towers in Memphis were one to two miles apart and that

-13-

a tower could reach about one-half to one mile before the next tower registered the phone. He said the change in towers could have been an anomaly or because the cell phone was close to the edge of the next tower's reception area, where the call would have been transferred and sent back.

On redirect examination, Mr. Johns testified that two towers were located between the Cox Street tower and tower 32. He said that the Regional Medical Center tower was downtown about eight to ten miles from the Midtown tower.

Jessica McGill testified that she knew the Defendant and saw him at a friend's house in December 2009. She said that she knew the Defendant's voice and that when she was in a different room, she overheard the Defendant make a comment about a firearm. She said the Defendant stated, "[T]he charge [would] never stick; they don't have the gun[.]" She said she contacted Sergeant Justice about the Defendant's comment. She believed the Defendant also said he had "gotten rid of a gun."

On cross-examination, Ms. McGill testified that she was unsure how many people were at her friend's house when she heard the Defendant, that it was not a party, and that a couple of people were there. She did not recall the date or if it was daylight or dark. She said that it was 2009 and that drugs and alcohol were not present. She said that she and Ben Thompson were in one room and that the Defendant was in an adjoining room. She said she did not remember the Defendant's exact words. She agreed she heard statements about a gun but said she could not go further and still be honest.

Dennis Ray Sullivan testified that he was incarcerated at the time of the trial for a methamphetamine conviction, that he had been incarcerated since 2008, and that he had several previous felony convictions for drug offenses, theft, and coercion of a witness. He said he knew the Defendant because they were incarcerated together. He said the Defendant told him about a murder that happened in 2009. He said the Defendant stated that two men were together, that one was robbed, and that the shooter wore a hoodie and could not be identified. He said the Defendant told him that he was being blamed for the shooting but that the DNA found on the body did not match his. He said the Defendant told him that the Defendant's brother was in the hospital and that there was no proof the cell phone was with the Defendant. He said the Defendant spoke in third person and did not say, "I." He said the Defendant told him all the facts and explained that the police could not prove he was the shooter.

Mr. Sullivan testified that he met Ben Carlisle at the penal farm. He said that Mr. Carlisle received probation from the trial judge and that the Defendant was paranoid about why his brother received probation. He said the Defendant told him that he was accused of

shooting "Mark – Mike – something of that nature" close to the Defendant's mother's house and that the victim was in a band or a musician. He said the Defendant told him that a weapon was found under a garbage can but that the weapon did not match ballistics from the scene. He said the Defendant explained that anyone could buy a file and use it on the inside of the barrel of a gun to prevent it from matching ballistics. He stated that the Defendant told him someone was robbed for money but did not mention drugs. Mr. Sullivan said later, though, it was a drug deal. He said the Defendant read from a piece of paper he kept in his back pocket, then folded and returned it to his back pocket. He said the Defendant told him his brother was at the Med when the shooting occurred. He said that around Christmas, the Defendant referred to this case and stated, "I know somebody who is not having a good Christmas this year, and I don't care if their family is either. . . . And the police can't prove anything." He said he did not know anything about the shooting until the Defendant told him.

Mr. Sullivan testified that he knew James Lee. He said that the Defendant asked him if he knew Mr. Lee, that he said he did, and that the Defendant stated, "That b---- snitched on me." He said that after he said he knew Mr. Lee, the Defendant told him about the shooting. He said the Defendant made threats about Mr. Lee and his family. He said that when he was in a holding area before testifying, the Defendant pointed at him and shook his head.

Mr. Sullivan testified that he was serving a twelve-year sentence. He said the State had not promised him anything for his testimony at the trial. He said he testified because he had an addiction but had turned his life around and given it to God. He said he was scheduled to be released the following July.

On cross-examination, Mr. Sullivan testified that he had several convictions. He said he was incarcerated with the Defendant at "201" and at the penal farm. He said life in jail was different than life "on the streets" but denied that other inmates had to make themselves appear tougher in jail. He denied knowing Brian Nelson. He said that he and the Defendant were friends when they were incarcerated together and that the Defendant "snapped" on him a few times but that he still talked to the Defendant. He said being in jail was stressful.

Mr. Sullivan testified that he and the Defendant had cases pending when they were in jail but that he did not talk with the Defendant about his case because his was "cut and dried." He said he talked to the Defendant about his case when he returned from court. He said that when he wrote a letter to the homicide division about his conversations with the Defendant, he was "looking at a lot of time" and that his motives were different at the time he wrote the letter than they were at the time of the trial. He said that when he wrote the letter, he was "looking after" himself. He said, though, that no one contacted him before he

-15-

began serving his sentence. He said he wrote two letters, one in 2009 when he and the Defendant were incarcerated together and one when he was transferred to serve his prison sentence. He stated that the second letter said he "already signed for [his] time," that the Defendant had told him information, but that he did not want anything in return for the information.

Mr. Sullivan testified that the police did not begin asking questions when they came to see him, that he talked about the case first, that the police then asked specific questions, and that his interview was recorded. He said that he told the police everything he could remember and that if he remembered anything later, he would let them know. He said he signed and dated a written statement. He agreed that his statement did not include the Defendant's threats about James Lee and his family. He said he did not tell the State about the threats until the trial because it "just came" to him when he was testifying. He agreed his testimony concerning the Defendant's comments around Christmas about the victim and the victim's family were not in his statement but were in a letter.

Mr. Sullivan testified that he and the Defendant spoke daily when they were incarcerated together. He said the Defendant approached him and stated, "We should have life, but we got away with it, what are we gonna [sic] do when we get out?" He said that he had no reason to receive a life sentence and that the Defendant must have been talking about himself. He said that when they discussed his case, the Defendant said, "They can't prove that I did it; so that whoever did it – whoever was wearing the hoodie . . . that ran off after the guy got shot and the other guy ran off." He said the Defendant did not say "I" and did not say that he was there that night, that he robbed someone, that he was involved in a drug deal, or that he used a gun to shoot someone. He said the Defendant told him "the whole case and the whole situation." He stated that he did not know what the papers were that the Defendant read, that he did not see a discovery packet, and that he could not say the Defendant was reading the discovery. He said that the Defendant did not tell him he killed the victim and that the closest the Defendant came were his statements at Christmas.

Mr. Sullivan testified that the police did not talk to him after he wrote the first letter but that when he went to prison and began the drug program, he wrote another letter and spoke with the police. He said that he was being released in June and that he was not receiving anything for his testimony. On redirect examination, Mr. Sullivan said that he did not talk to anyone else about an April 4 murder while he was incarcerated and that he did not see or read the news about the murder.

James Lee testified that he had been convicted of burglary and theft several times and that his record dated from 1986. He said he contacted Sergeant Justice in October 2009 to give her information he had heard about a shooting. He stated that he was at the penal farm

with the Defendant and that in June 2009, the Defendant said he was concerned because Sergeant Justice was coming to see him. The Defendant told him that the police had found a cigarette butt at the scene and that he was afraid his DNA was found on it. He said the Defendant told him that on April 3 and 4, he was "high" and robbed someone, that he thought the other person reached for something, and that he "emptied the gun on the guy." He said the Defendant was not the victim but was the perpetrator because he had the gun. He said the Defendant did not remember if someone else was present. He said the Defendant told him that he pulled the gun, that he fell or stepped back, that the other person was shot, and that he ran. The Defendant told him the victim was a musician who played in the "Cooper and Young area." He said the Defendant told him the shooting occurred around the Defendant's mother's house. He said that he did not see any media coverage of this case while he was in jail and that all his knowledge on the matter came from the Defendant. He said that Sergeant Justice did not offer him anything for his testimony and that he had already served his sentence before he spoke with the prosecutor.

On cross-examination, Mr. Lee testified that he knew the Defendant before they were in jail together and that he knew Mr. Sullivan but that he and Mr. Sullivan had not discussed the shooting because they were in jail together before it occurred. He said the Defendant told him he was "going to get some money" but did not mention a drug deal. He denied the Defendant told him that the buyer gave him paper wrapped in dollar bills or that there was a struggle. He said the Defendant told him that there was a robbery and that when the victim reached for something, the Defendant fired his gun. He denied the Defendant told him that he fired one shot or the type of weapon used. He agreed that people in jail may brag about things for their own protection and that the more credibility a prisoner had, the more likely he would be left alone. He said that he took the Defendant's statements as both a confession and "boastful credibility." He said that at the time of the trial, he thought the Defendant's statements were boasting and were lies.

Shelby County Sheriff's Department Sergeant Michaele Byers testified for the defense that she was the custodian of records for the jail. She said Brian Nelson and the Defendant were "housed" together on the first floor of J Pod from January 15, 2010, until February 17, 2010.

On cross-examination, Sergeant Byers testified that J Pod was the program pod in the jail and that up to sixty-four inmates could live in J Pod. She said she could find the names of all the inmates in J Pod but did not know their relationships or how much time they spent together.

-17-

On redirect examination, Sergeant Byers testified that the pod had cells where two inmates would be housed together and that the pod had a day room area. She said that the inmates were allowed access to the day room throughout the day to mingle.

Tony Geiser, a private investigator, testified that he reviewed the case file and that he interviewed Mark Cooke on September 9, 2010. He said Mr. Cooke told him he first heard the name "Zachary" sometime after the shooting during conversations with the police.

Upon this evidence, the jury convicted the Defendant of voluntary manslaughter and employing a firearm during the commission of a dangerous felony. The trial court sentenced the Defendant as a Range III, persistent offender to consecutive terms of fifteen years for the voluntary manslaughter conviction and fifteen years as a violent offender for the firearm conviction. This appeal followed.

**I**

The Defendant contends that the indictment failed to charge him properly with employing a firearm during the commission of a dangerous felony because it did not state the dangerous felony the Defendant committed while employing a firearm. The State contends that the issue is waived because defects in the indictment must be raised before the trial. In the alternative, the State contends that the indictment was valid and that the Defendant had notice because he was indicted and tried for two offenses, voluntary manslaughter and employing a firearm during the commission of a dangerous felony.

The statutory and constitutional requirements for an indictment are satisfied when the indictment fulfills the "overriding purpose of notice to the accused." *State v. Hammonds*, 30 S.W.3d 294, 300 (Tenn. 2000). "So long as an indictment performs its essential constitutional and statutory purposes, a defect or omission in the language of the indictment will not render the judgment void." *Hart v. State*, 21 S.W.3d 901, 903 (Tenn. 2000). Count One of the indictment states that the Defendant "did unlawfully and knowingly, and while in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner, kill" the victim, states the date of the offense as April 4, 2009, and cites Tennessee Code Annotated section 39-13-211, the voluntary manslaughter statute. Count Two of the indictment states that the Defendant "did unlawfully and knowingly employ a firearm during the commission of an offense as defined in T.C.A. 39-17-1324(i)(1)," states the date of the offense as April 4, 2009, and cites code section 39-17-1324(b).

Voluntary manslaughter is listed as a "dangerous felony" in the code section cited in the indictment, section 39-17-1324(i)(1), and was the only other offense charged in the

indictment. We conclude that the indictment provided the Defendant with adequate notice of the dangerous felony he was charged with committing while employing a firearm. The Defendant is not entitled to relief on the issue.

## II

The Defendant contends that the evidence is insufficient to support his convictions. He argues that the evidence did not show that he was the person who shot the victim. In the alternative, he argues that the evidence did not show that he intentionally or knowingly killed the victim. He argues that his voluntary manslaughter conviction was the underlying felony for the firearm conviction and that because the evidence is insufficient to support the voluntary manslaughter conviction, it must be insufficient to support the firearm conviction. The State counters that the evidence is sufficient to support the convictions. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. *See State v. Bland*, 958 S .W.2d 651, 659 (Tenn. 1997).

"'A crime may be established by direct evidence, circumstantial evidence, or a combination of the two.'" *State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005) (quoting *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998)). The standard of proof is the same, whether the evidence is direct or circumstantial. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Id.* (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Relevant to the Defendant's voluntary manslaughter conviction, "Voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a) (2010). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." *Id.* at § 39-11-302(b). "When acting knowingly suffices to establish an element, that element is also established if a person acts intentionally." *Id.* at § 39-11-301(a)(2). "[A]

person . . . acts intentionally with respect to the nature of the conduct or to a result of conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id.* at § 39-11-302(a).

In the light most favorable to the State, the Defendant arranged a drug deal with the victim on South Cox Street. Mr. Cooke went with the victim and saw the victim wrap strips of green paper with real money to exchange for the drugs. He saw the victim exchange the paper and money for drugs with another man. He heard the victim call the man they met "Zak" and later learned from friends that Zak was the Defendant. After the victim exchanged the fake money for the drugs, the man pulled a gun and chased the victim around a car attempting to hit him with the gun. After running into a neighboring yard, Mr. Cooke saw the man and the victim wrestling and then heard a "click, click, pop."

Mr. Nelson testified that on the night of the murder, he was with "Ronnie," who provided the drugs to the Defendant to sell to the victim. Although the Defendant's brother told Sergeant Justice his phone was with him at the hospital at the time of the murder, Mr. Nelson said the Defendant used his brother's cell phone to request drugs from Ronnie. He said the Defendant had a gun that night, which he kept in the "hoodie" he was wearing. He said that he and Ronnie picked up the Defendant, took him to South Cox Street for the drug deal, and waited in the car across the street when the Defendant went to meet the buyer, whom the Defendant had called "Mike" on the phone. Mr. Nelson saw the Defendant exchange the drugs for the money, saw the Defendant chase Mike around a car and into a yard, heard a gunshot, and saw Mike grab his neck and run.

Testimony from Mr. Smythe, the president of Yellow Cab, and Mr. Grills, the taxi cab driver, showed that the Defendant was picked up at a Krystal Restaurant on Union Avenue and taken to South Cox Street. The record shows that "Zack" used the Defendant's brother's cell phone to call the taxi company at 9:35 on the night of the shooting. Mr. Johns, the AT&T engineer, explained that the cell phone records showed that Benjamin Carlisle's phone made several calls to the victim shortly before the shooting and that the phone was in the area of South Cox Street all night, not at the hospital.

Ms. McGill heard the Defendant state that his charges would not "stick" because the police did not have the gun, and she believed he said he disposed of a gun. When the Defendant was incarcerated with Mr. Sullivan, he gave details about the murder and said that he knew "somebody who [was] not having a good Christmas . . . and [didn't] care if their family [was] either." The Defendant told Mr. Lee that on April 3 and 4, he robbed someone and that he "emptied the gun on the guy" when the victim reached for something.

Officer Barrett said the victim was bleeding from his neck. Mr. Nelson said that after he heard the gunshot, "Mike" grabbed his neck. Dr. Ross classified the death as a homicide and said the victim suffered a gunshot entrance wound on the left side of the base of his neck and died from a gunshot wound to the torso. We conclude that a reasonable trier of fact could have found beyond a reasonable doubt that the Defendant intentionally or knowingly shot and killed the victim.

Relevant to the Defendant's firearm conviction, it is an offense to employ a firearm during the commission of a dangerous felony. T.C.A. § 39-17-1324(b)(1). Voluntary manslaughter is a dangerous felony. T.C.A. § 39-17-1324(i)(1)(C). We have concluded the evidence is sufficient to sustain the Defendant's voluntary manslaughter conviction. The evidence established that the Defendant shot the victim and is sufficient to sustain the firearm conviction.

### III

The Defendant contends that the trial court committed plain error by failing to instruct the jury on self-defense, acknowledging that he failed to file a motion for new trial. He argues that self-defense was fairly raised during the trial, that defense counsel requested the instruction, and that the court did not include it. The State responds that self-defense was not fairly raised by the evidence. The State argues that the Defendant was engaged in a drug deal, an unlawful activity, and that no evidence showed the victim was armed or threatened the Defendant.

When an issue has not been properly preserved on appeal, this court may grant relief if plain error exists. T.R.A.P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."). Our supreme court has adopted the factors developed by this court to be considered:

> when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The record must establish all five factors before plain error will be recognized and "complete consideration of all the factors is not necessary when

it is clear from the record that at least one of the factors cannot be established." *Smith*, 24 S.W.3d at 283. In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the [proceedings]," and "recognition should be limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *Adkisson*, 899 S.W.2d at 642.

In criminal cases, the trial court has the duty to charge the jury on all the law that applies to the facts of the case. *See State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992) (citing *State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975)). The defendant also "has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge." *Thompson*, 519 S.W.2d at 792; *see* T.C.A. § 39-11-203(c) (2010) (entitling a defendant to have the issue of the existence of a defense submitted to the jury when it is fairly raised by the proof). An erroneous jury instruction may deprive the defendant of the constitutional right to a jury trial. *See State v. Garrison*, 40 S.W.3d 426, 433-34 (Tenn. 2000).

An instruction on a defense must be given if fairly raised by the proof regardless of whether the defense relies on the theory or requests that an instruction be given as to that theory. *See State v. Sims*, 45 S.W.3d 1, 9 (Tenn. 2001). "In determining whether a defense instruction is raised by the evidence, the court must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense." *Id.*; *see State v. Bult*, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998); *State v. Shropshire*, 874 S.W.2d 634, 639 (Tenn. Crim. App. 1993). If evidence has been presented which reasonable minds could accept as a defense, the trial court has a duty to charge that defense to the jury. *See Thompson*, 519 S.W.2d at 792; *Sims*, 45 S.W.3d at 9. Tennessee Code Annotated section 39-11-611(b)(2)(A)-(C) (2010) states,

> [A] person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if: (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury; (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and (C) The belief of danger is founded upon reasonable grounds.

Even in the light most favorable to the Defendant, he was not engaged in a lawful activity. Counsel asked the trial court for a jury instruction on self-defense based on the testimony of two witnesses, Mr. Cooke and Mr. Lee. Mr. Cooke testified that he witnessed a drug transaction between the Defendant and the victim, saw the two wrestling, and heard a gunshot and that the victim died after being shot. Mr. Lee testified that the Defendant told

him that when he was robbing the victim or asking the victim for money, the victim reached for something and that he shot the victim.  Further, no evidence in the record suggests the victim threatened the Defendant with a deadly weapon or force, and the evidence shows the victim was walking away when the Defendant chased him to retrieve the drugs he had exchanged for money and strips of paper.  The instruction did not apply, and we conclude that the trial court did not err by declining to instruct the jury on self-defense.

**IV**

The Defendant contends that the trial court committed plain error by instructing the jury that his statements could qualify as confessions, acknowledging that the issue was not preserved at the trial.  He argues that none of his statements contained all the elements necessary to constitute the crimes charged.  The State contends that the court  instructed the jurors that the Defendant's statements were confessions or admissions against interest.  The State argues that even if the Defendant's statements were admissions and not confessions, such error by the court did not adversely affect a substantial right of the Defendant.  Because the Defendant failed to file a timely motion for a new trial, the issue is waived.  *See* T.R.A.P. 3(e), 36(b).  We review the issue under plain error analysis.

"To qualify as a confession, a statement of an accused must admit all the elements necessary to constitute the crime with which he is charged."  *State v. Lee*, 631 S.W.2d 453, 455 (Tenn. Crim. App. 1982).  An admission is something less than a confession.  An admission is an acknowledgment by the defendant of certain facts that tend to establish guilt when taken with other facts.  *See Helton v. State*, 547 S.W.2d 564, 567 (Tenn. 1977), *overruled on other grounds as stated in State v. Davis*, 613 S.W.2d 218, 221 (Tenn. 1978).  "'An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law.'"  *State v. Majors*, 318 S.W.3d 850, 864-65 (Tenn. 2010) (quoting *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005)).

It is undisputed that the Defendant made statements to several witnesses and that his statements were introduced at the trial.  The trial court's instructions noted that evidence of the Defendant's statements was introduced at the trial "to show a confession or admission against interest" and defined both for the jury.  The court advised the jurors that it was their duty to determine if the statements were actually made and the truth of the statements by considering the surrounding circumstances and any contradictory evidence and that if they determined a statement was made and was true, they must consider it as a whole and not arbitrarily disregard any part.  The jurors were advised that they were the sole judges of the weight to be given to the statements and that all other evidence in the case should be considered along with the statements in determining guilt or innocence.  The court made no

comments regarding its opinion of the statements and did not determine whether the Defendant's statements were confessions or admissions. Both confessions and admissions were defined for the jurors to make their own determination. This issue is without merit.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE